

# NUMBER 13-12-00345-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JOSE ANTONIO
TORRES FLAMENCO,                                                    Appellant,

v.

THE STATE OF TEXAS,                                                 Appellee.

On appeal from the 430th District Court
of Hidalgo County, Texas.

# MEMORANDUM OPINION

**Before Justices Rodriguez, Garza, and Benavides**
**Memorandum Opinion by Justice Benavides**

Appellant, Jose Antonio Torres Flamenco, appeals his conviction for murder, a

first-degree felony.   *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West, Westlaw through

2013 3d C.S.).   By three issues, Flamenco asserts that:   (1) the trial court erred in

denying his requested jury definition for an accomplice as a matter of law; (2) the trial court erred by allowing a detective to testify about the body language of the suspects in this case; and (3) the evidence is insufficient to support his conviction. We affirm.

## I. BACKGROUND

A Hidalgo County grand jury indicted Flamenco for the murder of Yvette Cardenas. Flamenco pleaded not guilty and was tried before a Hidalgo County jury. The record reveals the following:

On April 18, 2011, McAllen police responded to a call from the Royal Inn Motel on the 600 block of South 10th Street in reference to an unresponsive female found in one of the motel's guest rooms. Officer Rodolfo Rios arrived at the scene and discovered a woman, later identified as Cardenas, half-clothed and lying in a "fetal" position on the floor of Room 217. According to Officer Rios, Cardenas's body looked "stiff" and had no pulse. A short time later, Officer Robert Del Angel arrived and investigated the crime scene. Officer Del Angel collected evidence from Room 217, including a pack of Pall Mall cigarettes. Officer Del Angel testified that Cardenas's torso was "twisted" and blood flowed out of her nose and mouth. Officer Del Angel also retrieved surveillance footage from the motel's front office, which depicted two males, later identified by police as Flamenco and Marlon Velasquez, arriving at the Royal Inn Motel with Cardenas in the early morning hours of April 18, 2011. The surveillance footage showed that Velasquez wore a khaki shirt, shorts, and sandals, while Flamenco wore glasses, a blue shirt, blue jeans, and black slip-on shoes with a white lining.

Police eventually tracked down Flamenco at his residence across the street from

2

the Royal Inn Motel.   Officers spoke to Flamenco and his wife, and both agreed to go to the McAllen police station for further questioning.   At the station, Detectives Carlos Garcia and Francisco Lopez interviewed Flamenco, while other officers spoke to his wife.   Detectives showed Flamenco the surveillance footage from the motel, but Flamenco denied being the individual in the video and denied knowing Velasquez. However, according to Detective Garcia, Flamenco's wife identified both her husband and Velasquez when police showed her the same surveillance footage.   Flamenco also told detectives that he did not go to the Royal Inn Motel on April 17, 2011, but Detective Garcia testified that Flamenco ultimately changed his story and told police, "You know . . . what?   I'm going to tell you what happened."

According to Detective Lopez, Flamenco admitted during the interrogation to knowing Velasquez.   Flamenco also told the detectives that he and Velasquez were together on the night of the murder.   Flamenco told Detective Lopez that on April 17, 2011, the night of the murder, he and Velasquez drank beer at Velasquez's home, purchased cocaine, and later traveled in Velasquez's car to La Casita Motel, an establishment apparently known for prostitution, in order to find a female for sex.   At La Casita, Flamenco and Velasquez encountered Cardenas, who entered Velasquez's car and directed them to take her to the Royal Inn Motel.   Flamenco recounted that at the Royal Inn Motel, he, Cardenas, and Velasquez lay on the bed drinking beer and using cocaine.   Flamenco told police that he then became worried that his wife could see him from their home across the street from the Royal Inn, so he stood at the room's only window to keep a look out.   Detective Lopez testified that while Flamenco stood at the

3

window, facing away from the motel's bed, Flamenco heard a slap, turned around, and saw Velasquez hitting Cardenas. Flamenco observed Cardenas roll off the bed and saw Velasquez stomp on her face. Flamenco told the detectives that they then picked up the beer cans, put them in a plastic bag, and left the room. Detective Garcia testified that Flamenco smoked Pall Mall-brand cigarettes, and Flamenco told the detectives that Cardenas stole a pack of Pall Mall cigarettes from Velasquez's car.

During their investigation, police recovered several items from Flamenco's home and Velasquez's home, including a pair of black slip-on shoes that resembled the pair worn by Flamenco and a pair of sandals that resembled the pair worn by Velasquez on the night of the murder.

Velasquez testified at trial. According to Velasquez, he and Flamenco were acquaintances and had met five months prior to Cardenas's murder. Velasquez stated that he and Flamenco were together on April 17, 2011. According to Velasquez, he purchased cocaine at Flamenco's request that night, and then they drank beer at his home. After drinking beer, Velasquez and Flamenco traveled to La Casita Motel and saw Cardenas walking outside of the motel. Velasquez testified that Flamenco asked him to stop the car, and Flamenco spoke to Cardenas, who eventually entered the vehicle. The trio then traveled to a "yellow hotel"[1] on 10th Street and went upstairs into a room.

Velasquez testified that once inside the room, Flamenco and Cardenas lay on the bed, while he remained standing. Velasquez recalled that Flamenco and Cardenas

---

[1] Velasquez could not recall the name of the Royal Inn Motel.

used cocaine on the bed. An argument ensued because Cardenas demanded that Flamenco pay her first before having sex, while Flamenco wanted to have sex first. Velasquez recalled that Flamenco hit Cardenas in the face with a closed fist, and Cardenas fell off the bed. According to Velasquez, Cardenas never screamed during the altercation. After witnessing Flamenco punch Cardenas, Velasquez went inside the motel room's bathroom and washed his hands. Upon exiting the bathroom, Velasquez witnessed Flamenco continue to hit Cardenas and choke her as she lay on the floor. Velasquez said that he tried to leave the motel room, but Flamenco threatened to hurt him if he left. Velasquez testified that before they left the room, Flamenco handed him a bag of trash to carry out of the room. They both left the motel parking lot in Velasquez's car. Velasquez stated that Flamenco told him that he had left a cigarette box in the motel room and wanted to retrieve it, but Velasquez declined to return to the motel. Flamenco did not testify.

Detective Lopez testified that Velasquez's story appeared to "flow[] better" than Flamenco's because Velasquez answered the detective's questions "without hesitation," and also mentioned the fact that Flamenco choked Cardenas. During his interview with police, Flamenco never mentioned Velasquez choking Cardenas. When asked about whether Cardenas was strangled, Flamenco did not answer the question. When Detective Lopez asked Flamenco whether he recalled Cardenas defending herself from the attack, Flamenco remarked to the detectives how easy it was to control a female, if you hit them hard enough. Detective Lopez also identified inconsistencies in Flamenco's story to police, including denying his identity in the surveillance video and

5

telling police that he wore a red shirt on the night of the murder, while the video showed him wearing a blue long-sleeved shirt.

Norma Jean Farley, M.D. testified that she autopsied Cardenas's body. Dr. Farley found "quite a few injuries" around Cardenas's neck and under her chin and also discovered multiple contusions to Cardenas's head including on the eyes, as well as abrasions to the right upper and lower eyelid. Dr. Farley also noted a small abrasion on the right side of Cardenas's face and contusions to Cardenas's left cheek, left ear, and on the inferior chin and right jaw line. Dr. Farley stated that several injuries supported a finding that Cardenas was strangled. Among the injuries noted were: (1) three blue areas on the back posterolateral left neck; (2) "pinpoint hemorrhages" in Cardenas's conjunctivae, which is a sign of asphyxia; (3) hemorrhaging on the neck muscles; and (4) a right-side fracture to Cardenas's hyoid bone with hemorrhaging to the surrounding muscle and tissue. According to Dr. Farley, the hyoid bone is a u-shaped bone located near the base of the tongue, and the fracture along with the hemorrhaging around the bone was "enough" evidence for her to make a diagnosis of strangulation as Cardenas's cause of death. Dr. Farley opined that Cardenas was still alive at the time she sustained the injuries to her neck.

Edna Zavala, a forensic scientist with the Texas Department of Public Safety, also testified. Zavala tested several pieces of evidence recovered by police and compared the evidence with DNA samples from Flamenco, Velasquez, and Cardenas. Zavala testified that Flamenco's black slip-on shoe had a blood stain located on the side of the shoe. According to Zavala, the blood stain contained a mixture of DNA from Cardenas,

Flamenco, and an unknown individual. Velasquez was excluded as a contributor to the DNA on Flamenco's shoe. No other relevant DNA results were discovered.

Flamenco's mother testified on his behalf. During her testimony, she denied an earlier accusation lodged by Velasquez that she had visited Velasquez in jail in an attempt to persuade him to take the blame for the murder in exchange for Flamenco's mother sending Velasquez's mother money.

The jury found Flamenco guilty as charged and assessed punishment at fifty-five years' imprisonment with the Texas Department of Criminal Justice's Institutional Division. This appeal followed.

## II. ACCOMPLICE AS A MATTER OF LAW INSTRUCTION

By his first issue, Flamenco asserts that the trial court erred by denying his requested instruction that Velasquez was an accomplice as a matter of law.

### A. Standard of Review

Our first duty in analyzing a jury-charge issue is to determine whether error exists. *See Ngo v. State,* 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc). If we find error, we analyze it for harm. *Id.* The degree of harm necessary for reversal depends on whether the error was preserved by requesting the proposed jury instruction. *See Oursbourn v. State*, 259 S.W.3d 159, 168–69 (Tex. Crim. App. 2008) ("[T]he defense must request a jury instruction before any error can result."). If the error was preserved by objection, we will reverse if we find "some harm" to the defendant's rights. "Some harm" means any harm, regardless of degree. *Arline v. State*, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986) (en banc); *see Atkinson v. State*, 934 S.W.2d 896, 897 (Tex.

App.—Fort Worth 1996, no pet.). Under a "some-harm" analysis, we are obligated to determine whether the error was "calculated to injure the rights of the defendant." *See Arline*, 721 S.W.2d at 352. We consider the harmfulness in context of the entire record. *Id.* If no objection was made, we will reverse only if the record shows "egregious harm" to the defendant. *Ngo*, 175 S.W.3d at 743.

### B. Applicable Law

An accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (citation omitted). Presence at the crime scene does not make a person an accomplice; an accomplice must have engaged in an affirmative act that promotes the commission of the offense that the accused committed. *Id.* (internal citations omitted). The evidence in each case will dictate whether an accomplice as a matter of law or fact instruction is required. *Id.* When the evidence clearly shows (i.e., there is no doubt) that a witness is an accomplice as a matter of law, the trial judge must instruct the jury accordingly. *Id.* (citing *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987)); *see Cocke v. State*, 201 S.W.3d 744, 748 ("If a witness is an accomplice as a matter of law, the trial court is required to provide an accomplice-witness instruction to the jury."). When there is doubt as to whether a witness is an accomplice (i.e., the evidence is conflicting), then the trial judge may instruct the jury to determine a witness's status as a fact issue. *Smith*, 332 S.W.3d at 439–40. Finally, when the evidence clearly shows that a witness is not an accomplice, the trial judge is not obliged to instruct the jury on the accomplice witness rule—as a matter of law or fact. *Id.* at 440. The

8

charge of the court must distinctly set forth the law applicable to the case, not express any opinion as to the weight of the evidence, not summarize the testimony, or discuss the facts or use any argument calculated to arouse the sympathy or excite the passions of the jury. TEX. CODE CRIM. PROC. ANN. art. 36.14 (West, Westlaw through 2013 3d C.S.).

**C. Discussion**

During the charge conference, the trial court found that Velasquez's status as an accomplice was "undisputed" in this case.[2] As a result, the trial court instructed the jury as follows:

9.

An accomplice witness is someone who has participated with another before, during, or after the commission of the crime. A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; the corroboration is not sufficient if it merely shows the commission of the offense.

You are also instructed that in this case, Marlon Velasquez is an accomplice witness, if an offense was committed as alleged in the indictment. . . .

Flamenco sought to add additional language under Paragraph 9 of the trial court's charge to include a definition that an accomplice witness may be one as a matter of law or as a matter of fact. Furthermore, Flamenco wanted the following language inserted into Paragraph 9 of the charge, after the first sentence: "If a witness has been indicted for the crime the defendant is accused of, he or she is an accomplice as a matter of law." This request was denied.

---

[2] Velasquez was indicted along with Flamenco for Cardenas's murder. However, Velasquez testified that in exchange for his testimony, the murder charge would be dismissed.

9

After reviewing Flamenco's requested additional definition, we conclude that it was superfluous and unnecessary. The trial court's charge clearly states the definition of an accomplice, identifies Velasquez as an accomplice, and provides the requisite accomplice-witness instruction as provided by article 38.14 of the code of criminal procedure and the corresponding case law. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West, Westlaw through 2013 3d C.S.); *Cocke*, 201 S.W.3d at 747–48 (interpreting article 38.14 and explaining the purpose of the accomplice-witness instruction). Accordingly, we conclude that no charge error exists, and our analysis ends here. *See Ngo*, 175 S.W.3d at 743. Flamenco's first issue is overruled.

### III. ADMISSIBILITY OF TESTIMONY

By his second issue, Flamenco contends that the trial court erred by overruling his objection to Detective Garcia's testimony about Flamenco's body language in the surveillance footage collected from the Royal Inn Motel.

### A. Standard of Review and Applicable Law

We use an abuse of discretion standard in reviewing a trial court's determination of a witness's qualifications as an expert and judgment regarding the admission of any expert testimony. *Ellison v. State*, 201 S.W.3d 714, 722 (Tex. Crim. App. 2006). Absent a clear abuse of that discretion, the trial court's decision to admit or exclude testimony will not be disturbed. *Id.*

Both lay and expert witnesses can offer opinion testimony. *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002). Rule 701 deals with witnesses who "witnessed" or participated in the events to which he or she is testifying, while Rule 702

allows for a witness who was brought in as an expert to testify. *Id.*; *see* TEX. R. EVID. 701, 702. Rule 701 requires the proponent of lay-opinion testimony to establish that the witness has personal knowledge of the events upon which his opinion is based. *Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997). Personal knowledge may come directly from the witness's senses, or it may also come from experience. *Id.* If the proponent of the opinion cannot establish personal knowledge, the lay testimony should be excluded. *Id.*

It is impossible for a witness to possess personal knowledge of what someone else is thinking because the individual is the only one who knows for certain the mental state with which he or she is acting. *Id.* at 899 (citing *Arnold v. State*, 853 S.W.2d 543, 547 (Tex. Crim. App. 1993)). Therefore, if the trial court determines that a proffered lay-witness opinion is an attempt to communicate the actual subjective mental state of the actor, the court should exclude the opinion because it could *never* be based on personal knowledge. *Id.* Likewise, if the witness's lack of personal knowledge yields testimony that amounts to "choosing up sides" or an opinion of guilt or innocence, his opinion should be excluded. *Id.*

However, not all Rule 701 opinions regarding culpable mental states need to be automatically excluded for want of personal knowledge. *Id.* An opinion may satisfy the personal knowledge requirement if such opinion is an interpretation of the witness's objective perception of events, of if it illuminates the distinction between personal knowledge of another's mental state and personal knowledge of perceived events. *Id.* In this situation, the jury is free to give as much or as little weight to the opinion as it sees

fit. *Id.*

Once the perception requirement is met, the trial court must determine whether the opinion is rationally based on that perception, i.e., that it is an opinion that a reasonable person could draw under the circumstances. *Id.* at 899–900. If the opinion is not capable of reasonably being formed from the events underlying the opinion, it must be excluded. *Id.* at 900. Finally, the trial court must determine whether the opinion would be helpful to the trier of fact to either understand the witness's testimony or to determine a fact in issue. *Id.*

When a witness who is capable of being qualified as an expert testifies regarding events which he or she personally perceived, the evidence may be admissible as both Rule 701 opinion testimony and Rule 702 expert testimony. *Osbourn*, 92 S.W.3d at 536. A person with specialized knowledge may testify about his or her own observations under Rule 701 and may also testify about the theories, facts and data used in his or her area of expertise under Rule 702. *Id.* Stated another way, a witness may qualify to give testimony both under Rule 702—because of his or her superior experiential capacity—and under Rule 701, if the witness's testimony and opinion are based upon firsthand knowledge. *Id.* (internal quotations omitted); *see* TEX. R. EVID. 701, 702.

## B. Discussion

In the present case, the State elicited testimony from Detective Garcia regarding Flamenco's and Velasquez's respective body language in the surveillance footage retrieved from the motel. The following exchange relates to Flamenco's complaint at

12

trial, after the trial court sustained Flamenco's initial objection to the State's line of questioning:

[Prosecutor]: Detective Garcia, in your ten years as a detective, how many times have you had to look at surveillance footage in order to sort of help you understand a crime?

[Det. Garcia]: Many times.

[Prosecutor]: Okay. More than 20?

[Det. Garcia]: Yes.

[Prosecutor]: More than 50?

[Det. Garcia]: Ah—over ten years, I would say, yes.

[Prosecutor]: As you watch those—have you ever seen a lookout on a case, on a piece of surveillance, or someone going into a store, or a restaurant, or anything like that?

[Det. Garcia]: Yes.

. . . .

[Prosecutor]: Can you observe things about a person's physical demeanor, or their emotional state by watching these videos?

[Det. Garcia]: Emotional? Maybe not. But just maybe the demeanor—

[Prosecutor]: Okay.

[Det. Garcia]: —just by looking at the video.

[Prosecutor]: So there are observations that you can make by the way someone's moving?

[Det. Garcia]: Yes.

[Prosecutor]: Have you conducted interviews with witnesses and

|  |  |
|---|---|
|  | suspects in your ten years as an investigator with the McAllen Police Department? |
| [Det. Garcia]: | Yes, I have. |
| [Prosecutor]: | Is reading someone's body language during an interview, or when they're giving statements, important? |
| [Det. Garcia]: | Yes, it is. |
| [Prosecutor]: | The more you get to interview people over your time, have you gotten better at reading people's body language? |
| [Det. Garcia]: | Yes, I have. |
| [Prosecutor]: | Does [sic] your observations in interviewing, translate to understanding how people move on a videotape? |
| [Det. Garcia]: | Yes. |
| [Prosecutor]: | Have you ever conducted surveillance on cases? |
| [Det. Garcia]: | Yes, I have. |
| [Prosecutor]: | When you're watching people, covertly, to decide if there's criminal activity going on, do you learn things from their body language? |
| [Det. Garcia]: | Yes, you do. |
| [Prosecutor]: | Back to the video in this case, did you notice things about the body language, about these three individuals? |
| [Defense]: | Objection, Your Honor. I don't think he's laid the proper predicate to establish him as an expert in body language. |
| The Court: | The objection is overruled. |

Detective Garcia then described the demeanor of both Flamenco and Velasquez

as "calm" and approximated the distances between Cardenas, Flamenco, and Velasquez as the three walked up to the motel room. Next, Detective Garcia observed that Velasquez walked out of the room first in a "quicker" fashion than Flamenco, while Flamenco was in a "[relaxed] mode." Later, when asked by the State who he thought was the "dominant personality" as between Flamenco and Garcia, Detective Garcia opined that Flamenco was "the one who was in charge," based upon his review of the surveillance video and the fact that Flamenco sat with Cardenas in Velasquez's backseat, after picking her up at La Casita Hotel.

Flamenco argues that allowing Detective Garcia's testimony interpreting Flamenco's body language amounted to an abuse of discretion. We disagree. First, Detective Garcia's testimony was opinion testimony admissible under Rule 701. *See Osbourn*, 92 S.W.3d at 536. Detective Garcia's testimony related to personal observations that he made from watching the surveillance footage related to Flamenco's and Velasquez's demeanor, the distance between Flamenco, Velasquez, and Cardenas, and the pace at which each of them walked. This testimony relates to Detective Garcia's interpretation of his objective perception of events, which is admissible, *see Fairow*, 943 S.W.2d at 899, rather than a "choosing of sides" or an attempt to communicate about Flamenco's actual subjective mental state or a decision of guilt or innocence, which is inadmissible. *See id.* Furthermore, the jurors watched the surveillance footage for themselves and were free to give as much or as little weight to Detective Garcia's testimony as they saw fit. *See id.*

Next, the trial court could have found that Detective Garcia's perceptions were

rationally based on his perception and a reasonable person could have drawn the same conclusion from viewing the surveillance footage by estimating distance and speed and evaluating demeanor. *See id.* 899–900. Finally, the trial court was within its discretion to conclude that such testimony would help the jury in determining the ultimate issue of guilt, because such testimony is relevant in outlining the appropriate facts of this case. *See id.* at 900 (discussing how opinion testimony is helpful if it is a shorthand rendition of the facts). Therefore, we conclude that the trial court did not abuse its discretion.

Moreover, even if we were to find that the trial court abused its discretion in allowing Detective Garcia to testify about Flamenco's body language, we nevertheless conclude that such abuse of discretion was harmless. *See* TEX. R. APP. P. 44.2(b). Non-constitutional error "that does not affect substantial rights must be disregarded." *Id.* Substantial rights are not affected by the erroneous admission of evidence if, after we examine the record as a whole, we have fair assurance that the error did not influence the jury, or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case. *Id.* We may also consider jury instructions, the State's theory, and any defensive theories, closing arguments, and voir dire, if applicable. *Id.* Finally, we may consider the State's emphasis on the error as a factor. *See id.*

In this case, any harm caused by the purported error of admitting Detective Garcia's opinion testimony was minimal in light of the record and the nature of other evidence supporting the verdict, as outlined in this opinion. Furthermore, as noted above, the jurors viewed the same surveillance footage described by Detective Garcia and were free to draw their own conclusions about the matters testified to by Detective Garcia. We acknowledge that the State described Flamenco as the "dominant personality" during closing arguments, but the State also encouraged the jurors to evaluate Flamenco's body language for themselves and determine whether they could draw the same opinions put forth by Detective Garcia. Accordingly, we conclude that the admission of Detective Garcia's "body language" testimony, if in error, was harmless and did not affect Flamenco's substantial rights. *See* TEX. R. APP. P. 44.2(b). Flamenco's second issue is overruled.

## IV. SUFFICIENCY CHALLENGE

By his final issue, Flamenco asserts that the evidence is insufficient to support his conviction.

### A. Standard of Review

In reviewing sufficiency of evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013); *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)); *see Brooks*

*v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.).   In viewing the evidence in the light most favorable to the verdict, we defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given to their testimony.   *Brooks*, 323 S.W.3d at 899.   It is unnecessary for every fact to point directly and independently to the guilt of the accused; it is enough if the finding of guilty is warranted by the cumulative force of all incriminating evidence.   *Winfrey*, 393 S.W.3d at 768.

The elements of the offense are measured as defined by a hypothetically correct jury charge.   *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).   Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.   *Id.*   Under a hypothetically correct jury charge, Flamenco is guilty of murder if he intentionally or knowingly caused Cardenas's death.   *See* Tex. Penal Code Ann. § 19.02.

## B.    Discussion

The State elicited direct testimony from Velasquez, Flamenco's accomplice, who testified that he witnessed Flamenco repeatedly punch and choke Cardenas inside Room 211 of the Royal Inn Motel in McAllen.   According to Flamenco's testimony, Cardenas appeared unconscious during the entire ordeal, as well as when the pair left the motel room.   Under the appropriate standard of review, we defer to the jury's

credibility determinations of witness testimony. *See Brooks*, 323 S.W. 3d at 899. After viewing all of the evidence in the light most favorable to the verdict, we also conclude that the evidence is legally sufficient to support Flamenco's conviction because after reviewing the record, a rational fact finder could have found that Flamenco murdered Cardenas beyond a reasonable doubt. *See Winfrey*, 393 S.W.3d at 768.

However, despite this eyewitness testimony, a conviction cannot be had upon the testimony of an accomplice, such as Velasquez, unless corroborated by other evidence tending to connect Flamenco with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense. TEX. CODE CRIM. PROC. 38.14. A challenge of insufficient corroboration is not the same as a challenge of insufficient evidence to support the verdict, but is instead governed by a different test. *Yost v. State*, 222 S.W.3d 865, 871 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd).[3] When reviewing the sufficiency of non-accomplice evidence under Article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense. *Smith*, 332 S.W.3d at 442. The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case. *Id.* The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. *Id.* So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does

---

[3] While Flamenco generally frames his final issue in terms of a legal sufficiency challenge to the verdict, Flamenco also appears to challenge the sufficiency of the evidence to corroborate accomplice testimony within that issue. Accordingly, we will examine both arguments separately under each challenge's respective tests.

not—we will defer to the factfinder's resolution of the evidence. *Id.* Therefore, it is not appropriate for appellate courts to independently construe the non-accomplice evidence. *Id.*

The evidence shows that Flamenco and Velasquez were the last two individuals with Cardenas prior to her death. We first note that testimony revealed that when the police officers initially interrogated Flamenco about the murder, he denied that he was one of the individuals in the surveillance footage, and he also denied knowing Velasquez. Flamenco also told police that he wore a red-colored shirt that night, despite the surveillance footage revealing that he wore a blue shirt. Additionally, Flamenco told police a different story about his whereabouts on the night of April 17, 2011, but later in the interrogation, Flamenco changed his story and told the police "what happened," which included blaming Velasquez for the murder. Courts have held that a defendant's statements and conduct after the crime can be used to show a consciousness of guilt. *See King v. State*, 29 S.W.3d 556, 564–65 (Tex. Crim. App. 2000); *Couchman v. State*, 3 S.W.3d 155, 163–64 (Tex. App.—Fort Worth 1999, pet. ref'd); *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.). Here, evidence of Flamenco's post-crime conduct and his changing stories to police tended to connect him to the offense.

Second, Flamenco told police that Velasquez stomped on Cardenas during the murder, but that he never told police that Velasquez choked Cardenas. Velasquez testified that he witnessed Flamenco choke Cardenas. Dr. Farley testified that based on a right-side fracture to Cardenas's hyoid bone, as well as surrounding trauma to the

muscle and tissue, she opined that Cardenas died by strangulation. This evidence also tended to connect Flamenco to the murder. *See Smith*, 332 S.W.3d at 442.

Finally, the evidence established that Flamenco told police that he never approached Cardenas once she fell to the floor and that he stayed close to the motel room's window, which was located on the opposite wall from where Cardenas's body was found. Despite this assertion to police, a blood stain was found on Flamenco's shoes, and DNA testing revealed that the stain contained Flamenco's as well as Cardenas's DNA. Detective Garcia testified that this particular crime scene was not "bloody" and that Cardenas's blood was found in an area no more than two feet from where her body was found. When taken together, this evidence would allow reasonable jurors to conclude that Flamenco lied to police and was within a close proximity to Cardenas's body.

After giving proper deference to the jury's resolution of the facts as discussed above, *see id.* at 447, we conclude that the evidence tends to connect Flamenco to Cardenas's murder. Flamenco's final issue is overruled.

## V. CONCLUSION

We affirm the trial court's judgment.

_____
GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
29th day of August, 2014.

21